J-S14002-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.0.P. 65.37
IN THE INTEREST OF: T.D.N.T.R., : IN THE SUPERIOR COURT OF
A MINOR : PENNSYLVANIA

APPEAL OF: R.R., MOTHER

No. 3185 EDA 2017

Appeal from the Order Entered August 15, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000753-2017

IN THE INTEREST OF: L.M.R., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA

APPEAL OF: R.R., MOTHER

No. 3186 EDA 2017

Appeal from the Order Entered August 15, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000754-2017

BEFORE: OTT, J., MCLAUGHLIN, J., and RANSOM*, J.

MEMORANDUM BY OTT, J.: FILED JUNE 05, 2018
R.R. (“Mother”) appeals from the decrees entered in the Court of

Common Pleas of Philadelphia County on August 15, 2017, involuntarily

terminating her parental rights to her son, T.D.N.T.R., born in February of

2015, and her daughter, L.M.R., born in April of 2011 (collectively, “Children”).

Mother’s court-appointed counsel has filed a petition for leave to withdraw as

* Retired Senior Judge assigned to the Superior Court.
J-S14002-18

counsel and a brief pursuant to Anders v. California, 386 U.S. 738 (1967).
We grant counsel’s petition and affirm the decrees.

In its opinion pursuant to Pa.R.A.P. 1925(a), the trial court set forth the
factual and procedural history of this case, which the testimonial evidence
supports. As such, we adopt it herein. See Trial Court Opinion, 11/9/17, at
2-17.

By way of background, on April 17, 2015, the Department of Human
Services (“DHS”) became involved with Mother, E.B. (“Father”), and the
Children upon receiving a report alleging that T.D.N.T.R. had fallen in the
home and sustained nearly fatal injuries. Trial Court Opinion, 11/9/17, at 2-
3, 5. Mother’s explanation of the incident was “while she and Father were
arguing, Father raised his hand as if to strike her while she was holding the
[c]hild and she dropped the [c]hild on a mattress to protect him[.]” Id. at 3.
On April 20, 2015, DHS met with Mother who stated, “Mother and Father
argued and Father physically assaulted her while she was holding T.D.N.T.R.;
that she dropped him onto a mattress during the incident and later fell on top
of him as Father continued to assault her[.]...” Id. at 4.

T.D.N.T.R.’S diagnosis was “acute or chronic bilateral subdural
hemorrhages, multilayer retinal hemorrhages in both eyes, a closed right rib
fracture, and a cervical spine injury, most likely due to abusive head trauma
in the absence of accidental trauma to account for the injuries.” Id. at 6. On

April 21, 2015, DHS received a supplemental report alleging that, “the [c]hild
J-S14002-18

was in critical condition based on suspected abuse; that he had internal
bleeding from old and new injuries; and that it was not known at that time if
the [c]hild would survive.” Id. at 5. The report alleged that Mother’s
explanation did not match T.D.N.T.R.’s injuries. Id. at 3. Rather, the report
alleged that, due to his injuries, T.D.N.T.R. “would had to have fallen from a
waist-high height onto a hard surface.” Id.

With respect to the older female child, L.M.R., who was nearly four years
old at the time of the incident involving T.D.N.T.R., DHS learned from hospital
staff on April 18, 2015, that she did not appear to have any injuries. Id. at
3. However, she “appeared to have some developmental delays and suffered
from non-verbal autism[.]” Id. at 3-4.

The Children were placed in protective custody on April 22, 2015.
T.D.N.T.R. was discharged from the hospital on April 28, 2015, and he was
placed in a foster home separate from his sister, L.M.R. The Children were
adjudicated dependent on May 13, 2015. On November 10, 2015, the trial
court found that aggravating circumstances existed as to Mother and Father.

The Community Umbrella Agency (“CUA”), Northeast Treatment Center
(“NET”), developed the following Single Case Plan (“SCP”) objectives for
Mother: attend the Children’s medical appointments; participate in the
supervised visitation schedule; schedule an assessment with the Behavioral
Health System (“BHS"); participate in a domestic violence program;

participate in and completing parenting classes; and comply with all court

-3-
J-S14002-18

orders and recommended programs. Id. at 8. The CUA subsequently
specified that Mother explore services for L.M.R. at Children’s Crisis Treatment
Center (“CCTC”) and participate in a domestic violence program at Women in
Transition. Id. at 9-10.

Commencing in October of 2015, permanency review hearings occurred
approximately every three months.t At the permanency review hearing in
May of 2016, the trial court found that T.D.N.T.R. received early intervention
services, occupational therapy, and physical therapy. Id. at 13. Further,
L.M.R. received occupational therapy, physical therapy, and trauma therapy.
Id. at 12-13. At the next hearing in August of 2016, the court found that
“L.M.R. receives special education.” Id. at 13.

On April 4, 2017, DHS received another supplemental report alleging
that Father “had made a written statement that day stating that on
4/17/2015, while engaging in an incident of domestic violence with Mother,
T.D.N.T.R. was thrown from Mother’s arms and hit his head on a piece of
furniture and then the floor.” Id, at 16 (citation to record omitted).

On July 27, 2017, DHS filed petitions for the involuntary termination of
Mother’s and Father's parental rights to the Children pursuant to 23 Pa.C.S. §

2511(a)(1), (2), (5), (8), and (b). A hearing occurred on the petition

1 The Honorable Allan L. Tereshko presided over the underlying dependency
matter and the subject involuntary termination proceeding.
J-S14002-18

regarding Mother on August 15, 2017, during which the Children were
represented by a Child Advocate and a Guardian Ad Litem (“GAL”).? DHS
presented the testimony of Erica Williams, Psy.D., the director of Forensic
Mental Health Services, who performed a parenting capacity evaluation of
Mother on February 23, 2017; and Beverly Ford-Green, the CUA case
manager. Mother testified on her own behalf. In addition, Mother was
represented by Anthony J. Voci, Jr., Esquire, whom she privately retained.
Dr. Williams testified that, in conducting the parenting capacity
evaluation, she learned that Mother had participated in two different
interviews during the investigation of T.D.N.T.R.’s nearly fatal injuries, and
that she “was adamant that it was an accident.” N.T., 8/15/17, at 32. She
testified that at the time of the parenting capacity evaluation on February 23,
2017, Mother “was able to identify [the cause of the incident] [as] active
aggression [on Father’s] part, but she still is not able to fully explain the
process of events. And when she discusses it, she limits her memory of it.

She doesn’t respond to follow-up questions. She’s not able to plan differently,

2 At the commencement of the proceedings, Father’s counsel requested to
withdraw his representation, which the trial court granted. Therefore, the
court re-scheduled the hearing on the petition with respect to Father for
January 30, 2018. Trial Court Opinion, 11/9/17, at 2. The record certified for
this appeal does not reveal the court’s disposition of that petition.

3 The Child Advocate and the GAL argued in support of the involuntary
termination of Mother’s parental rights to the Children during the hearing.
Neither has filed a brief in these appeals.

-5-
J-S14002-18

just to assert that she’s learned her lesson and she would do it differently, but
she can’t explain beyond that.” Id. at 36-37.

Dr. Williams opined that Mother “did not have the capacity for safety
and permanency at the time of the evaluation, particularly due to the ongoing
safety concerns.” Id. at 47. She summarized as follows.

[P]rior to the precipitating event [on April 17, 2015,] [T.D.N.T.R. ]
somehow suffered injuries that were healing and nobody was able
to identify how those injuries occurred, neither [Mother] nor
[Father]. Then the events occurred, even though she was aware
of his violent temper, they continued to reside together. He, I
later found out from him, swung at her in a smacking motion and
that’s what knocked [T.D.N.T.R.] out of her arms. She provided
misinformation at the time of medical intervention, which
immediately places the child at risk for her not to provide the true
sequence of events, particularly when you're providing emergency
care. So that judgment to not provide the accurate information is
a concern. And then moving on from there, she continues to
minimize the events and not see [Father] as capable of violence
going forward. She was unable to recall things that happened,
was able to say that she had a role, but couldn't identify the role
of what she could do differently. She was comfortable with the
[C]hildren going back with [Father] and she was not able to even
identify any of the concerns raised by CUA regarding her behaviors
that placed the [C]hildren[] . . . at ongoing risk.

Id. at 64-65.

Further, with respect to L.M.R., Dr. Williams testified that, while in the
care of Mother, she presented with “gross developmental delays. However,
outside of the care of... [MJjother, she has thrived and those delays have all
but disappeared.” Id. at 41.

To assist her in developing the capacity to parent, Dr. Williams made

the following recommendations, in part.

-6-
J-S14002-18

1. [Mother] continue in individual therapy. It is recommended
this treatment occur with a licensed individual with training and
experience in working with individuals involved in the physical
abuse of a child. In addition to identification and addressing of
mental health needs, it is important focus include supporting
[Mother] in developing an accurate narrative of the events leading
to her son’s near fatal injuries as well as when he obtained his
prior injuries. Once events are identified it is imperative therapy
focus on exploring the behavior cycles related to the events,
identification of role in the events and plan to recognize, manage
and prevent future behaviors.

2. If reunification remains the goal, it is important [Mother]
increase her engagement in [L.M.R. ]’s medical and mental health
appointments.

Parenting Capacity Evaluation, 2/23/17, at 15 (DHS Exhibit 6).

By decrees entered on August 15, 2017, the trial court terminated
Mother’s parental rights to the Children pursuant to 23 Pa.C.S. § 2511(a)(1),
(2), (5), (8), and (b). On September 14, 2017, Mother, acting pro se, timely
filed notices of appeal and concise statements of errors complained of on

appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b),* which this Court

consolidated sua sponte.

4 Mother asserted the following errors in her concise statement.

1. The Trial Court (Family Division) erred and abused its discretion
in denying my 6th Amendment right when I requested a
continuance in order to have representation from another
Attorney. This was requested so that I would have the
opportunity to be represented by an Attorney who would
represent my family’s best interests. The attorney, Anthony
Voci, who represented me at the hearing, never communicated
with me in the four months’ preceding my _ hearing;
furthermore, he was tardy (by 2 hours) and initially reluctant
J-S14002-18

On October 12, 2017, this Court granted the motion to withdraw as
counsel filed by Mother’s trial attorney, Attorney Voci, and directed the trial
court to appoint substitute counsel within ten days. By order dated October
17, 2017, the trial court appointed Michael Graves, Jr., Esquire, as Mother’s
appellate counsel. The trial court filed its opinion pursuant to Pa.R.A.P.
1925(a) on November 9, 2017.

On January 21, 2018, Attorney Graves filed a petition for leave to

withdraw as counsel and an Anders brief, which we must address before

to represent me as he expressed this to me outside the
courtroom. Therefore this already demonstrated a conflict of
interest. Nevertheless, the court ignored my request to fair
representation and proceeded with the hearing with the above
attorney, who had not prepared to represent me for my...
hearing on August 15, 2017.

2. The Trial Court (Family Division) erred in finding that DHS, NET
CUA 1 (Beverly Ford-Green), Support Center for Child
Advocates, (Guardian Ad Litem Jerry Desiderato, Attorney
Irene Levy), City Solicitor (Megan Fitzpatrick), ATA (Evaluator
Erica Williams) met their burden of proof by clear and
convincing evidence that terminating my parental rights
pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8).

3. The Trial Court (Family Division) erred in finding that DHS, NET
CUA 1 (Beverly Ford-Green), Support Center for Child
Advocates, (Guardian Ad Litem Jerry Desiderato, Attorney
Irene Levy), City Solicitor (Megan Fitzpatrick), ATA (Evaluator
- Erica Williams) met their burden of proof by clear and
convincing evidence that terminating my parental rights would
best meet to the developmental, physical and emotional needs
and welfare of [the Children] pursuant to 23 Pa.C.S.A. §
2511(b).

Mother’s Rule 1925(b) statement, 9/14/17.
- 8 -
J-S14002-18

reviewing the merits of this appeal. Commonwealth v. Rojas, 874 A.2d
638, 639 (Pa. Super. 2005) (quoting Commonwealth v. Smith, 700 A.2d
1301, 1303 (Pa. Super. 1997)).

In re V.E., 611 A.2d 1267 (Pa. Super. 1992), this Court extended the
Anders principles to appeals involving the termination of parental rights. In
Commonwealth v. Santiago, 978 A.2d 349 (Pa. 2009), our Supreme Court
explained, “the major thrust of Anders .. . is to assure that counsel
undertakes a careful assessment of any available claim that an indigent
appellant might have.” Id, at 358. The Court stated that this “is achieved by
requiring counsel to conduct an exhaustive examination of the record and by
also placing the responsibility on the reviewing court to make an independent
determination of the merits of the appeal.” Id.

In order to be permitted to withdraw, counsel must meet three
procedural requirements: 1) petition for leave to withdraw and state that,
after making a conscientious examination of the record, counsel has
determined that the appeal is frivolous; 2) furnish a copy of the Anders brief
to the appellant; and 3) advise the appellant that he or she has the right to
retain private counsel or raise, pro se, additional arguments that the appellant
deems worthy of the court’s attention. See Commonwealth v. Cartrette,
83 A.3d 1030, 1032 (Pa. Super. 2013) (en banc) (citation omitted). With
respect to the third requirement, this Court has held that counsel must “attach

to their petition to withdraw a copy of the letter sent to their client advising

-9-
J-S14002-18

him or her of their rights.” Commonwealth v. Millisock, 873 A.2d 748, 752
(Pa. Super. 2005).

Additionally, an Anders brief must comply with the following
requirements:

(1) provide a summary of the procedural history and facts, with
citations to the record;

(2) refer to anything in the record that counsel believes arguably
supports the appeal;

(3) set forth counsel’s conclusion that the appeal is frivolous; and

(4) state counsel’s reasons for concluding that the appeal is

frivolous. Counsel should articulate the relevant facts of record,

controlling case law, and/or statutes on point that have led to the
conclusion that the appeal is frivolous.
Santiago, 978 A.2d at 361.

Instantly, Mother’s counsel filed a petition to withdraw which complies
with the foregoing procedural requirements. In addition, counsel filed a brief,
which includes a summary of the history and facts of the case, potential issues
that could be raised by Mother, and his assessment of why those issues are
meritless, with citations to relevant legal authority. Therefore, Mother’s
counsel has satisfied the requirements of Anders and Santiago.

We next proceed to review the issue outlined in the Anders brief. In
addition, we must “conduct an independent review of the record to discern if
there are any additional, non-frivolous issues overlooked by counsel.”

Commonwealth v. Flowers, 113 A.3d 1246, 1250 (Pa. Super. 2015)

(footnote omitted).

-10-
J-S14002-18

In the Anders brief, counsel raises the issue of whether DHS satisfied
its burden of proof to terminate Mother’s parental rights pursuant to 23
Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).° Specifically, counsel states that
Mother complied with some of her SCP objectives.

We review this issue according to the following standard.

The standard of review in termination of parental rights cases
requires appellate courts to accept the findings of fact and
credibility determinations of the trial court if they are supported
by the record. If the factual findings are supported, appellate
courts review to determine if the trial court made an error of law
or abused its discretion. A decision may be reversed for an abuse
of discretion only upon demonstration of manifest
unreasonableness, partiality, prejudice, bias, or ill-will. The trial
court’s decision, however, should not be reversed merely because
the record would support a different result. We have previously
emphasized our deference to trial courts that often have first-hand
observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks
omitted).

The termination of parental rights is governed by Section 2511 of the
Adoption Act, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party

seeking termination must prove by clear and convincing evidence
that the parent’s conduct satisfies the statutory grounds for

> To the extent that the Anders brief raises an issue concerning the
permanency review orders changing the Children’s goals to adoption, we
conclude that it is waived because Mother did not file a notice of appeal from
those orders, and she did not assert any errors regarding them in her concise
statement of errors complained of on appeal. See Dietrich v. Dietrich, 923
A.2d 461, 463 (Pa. Super. 2007) (stating that when an appellant filed a Rule
1925(b) statement, any issues not raised in that statement are waived on

appeal).

-1i-
J-S14002-18

termination delineated in Section 2511(a). Only if the court
determines that the parent’s conduct warrants termination of his
or her parental rights does the court engage in the second part of
the analysis pursuant to Section 2511(b): determination of the
needs and welfare of the child under the standard of best interests
of the child. One major aspect of the needs and welfare analysis
concerns the nature and status of the emotional bond between
parent and child, with close attention paid to the effect on the child
of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). In
addition, we need only agree with the trial court as to any one subsection of
Section 2511(a), as well as Section 2511(b), in order to affirm. See In re
B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

In this case, the record evidence supports the court’s decision to
terminate Mother’s parental rights pursuant to the following statutory
provisions:

(a) General Rule.—The rights of a parent in regard to a child
may be terminated after a petition filed on any of the following
grounds:

(2) The repeated and continued incapacity, abuse, neglect
or refusal of the parent has caused the child to be without
essential parental care, control or subsistence necessary
for his physical or mental well-being and the conditions and
causes of the incapacity, abuse, neglect or refusal cannot
or will not be remedied by the parent.

(b) Other considerations.--The court in terminating the rights
of a parent shall give primary consideration to the developmental,
physical and emotional needs and welfare of the child. The rights
of a parent shall not be terminated solely on the basis of
environmental factors such as inadequate housing, furnishings,

-12-
J-S14002-18

income, clothing and medical care if found to be beyond the

control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any

efforts by the parent to remedy the conditions described therein

which are first initiated subsequent to the giving of notice of the

filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).°®

This Court has explained that the moving party must produce clear and
convincing evidence with respect to the following elements to terminate
parental rights pursuant to Section 2511(a)(2): (1) repeated and continued
incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or
refusal caused the child to be without essential parental care, control or
subsistence necessary for his physical or mental well-being; and (3) the
causes of the incapacity, abuse, neglect or refusal cannot or will not be
remedied. See In re Adoption of M.E.P., 825 A.2d 1266, 1272 (Pa. Super.
2003).

Pursuant to Section 2511(a)(2), parents are required to make diligent
efforts towards the reasonably prompt assumption of full parental
responsibilities. In re A.L.D. 797 A.2d 326, 340 (Pa. Super. 2002). A
parent’s vow to cooperate, after a long period of uncooperativeness regarding

the necessity or availability of services, may properly be rejected as untimely

or disingenuous. Id. Further, the grounds for termination of parental rights

© Based on this disposition, we need not review the decrees pursuant to
Section 2511(a)(1), (5), and (8).

-13-
J-S14002-18

under Section 2511(a)(2), due to parental incapacity that cannot be remedied,
are not limited to affirmative misconduct; to the contrary those grounds may
include acts of refusal as well as incapacity to perform parental duties. Id. at
337.

With respect to Section 2511(b), this Court has stated that,
“[i]ntangibles such as love, comfort, security, and stability are involved in the
inquiry into the needs and welfare of the child.” In re C.M.S., 884 A.2d 1284,
1287 (Pa. Super. 2005) (citation omitted). Further, the trial court “must also
discern the nature and status of the parent-child bond, with utmost attention
to the effect on the child of permanently severing that bond.” Id. (citation
omitted). However, “[i]n cases where there is no evidence of any bond
between the parent and child, it is reasonable to infer that no bond exists.
The extent of any bond analysis, therefore, necessarily depends on the
circumstances of the particular case.” In re K.Z.S., 946 A.2d 753, 762-763
(Pa. Super. 2008) (citation omitted).

In this case, the trial court stated on the record in open court at the
conclusion of the testimonial evidence, as follows.

[T]he issue of credibility looms very large since we have conflicting
versions of what has happened over the last 28 months.

[A]lthough counsel says that [M]other admits that she didn’t tell
the truth in the beginning, it was no such admission, because she
still maintained the narrative that she fell on the child while the
child was in the bed. And she now describes it as backed up on
the child. Her earlier description was fell on the child.

-14-
J-S14002-18

That’s disturbing to the [c]ourt, because it supports a person who
has not acknowledged the reality of what occurred and until today,
although she voices a certain narrative, the narrative hasn’‘t
changed. That presents an issue for the [c]Jourt in everything else
that [M]other says.

And after having listened to [M]other and having had jurisdiction
over this case from the beginning, I believe, I conducted the
aggravated circumstances hearing, heard the testimony from the
expert witnesses. And this child was not a child who fell onto a
bed and parent toppled over onto the child. This child has been
the victim of a consistent pattern of abuse and violence. No one’s
addressed the prior issue of the healing injuries of the child, other
than [M]other’s not credible attempt to explain that it occurred
during an incident with the car seat.

It’s a continued narrative, which [M]other refuses to accept the
reality of the brutality that was inflicted upon this child while in
her care in the care of the father. While she may not have been
the perpetrator of the actual violence, she stood by and watched
it occur[], knew it occurred, when it was occurring. And even
today, attempts to paint a different picture, paint a picture of a
man who has been found to have been abusive to a completely
helpless infant, suggesting that he may be an appropriate
caregiver for the child.

It engages the question whether [M]jother has the ability to
perceive the reality of threats to her children. And being unable
to perceive the reality of threats to her children, she certainly
could never be in a position of being charged with the safety of
her children.

As to the evidence of her addressing some of the goals, while
[M]other testified that she has been receiving this domestic
violence [program], other than her testimony, I have no evidence
of it. Today’s the day when you bring in your evidence. Today’s
the day of your hearing. Today is the day you get to present all
you have to make your case. And other than... what could be
considered as self-serving testimony, I [have] seen or heard
nothing independent of that to substantiate it.

But it goes to the issue of her treatment for her issues, the

domestic violence. There is no evidence that she completed the
child abuse training. There is no evidence that she ever engaged

-15-
J-S14002-18

in therapy which would allow her to acknowledge the child abuse
that brought this case in and is now one of the central reasons
why the child[ren] remain in care.

The evidence is clear and convincing that she has not remedied
the issues that brought these children into care. The limited
attempt at securing some domestic violence goes to the
[M]other’s issues that brought the children into care. It doesn’t
go to the issue of her putting herself in a position to care for these
children or provide safety, well-being for these children going
forward.

The evidence is clear and convincing that she has no ability to
remedy the issues that brought the children into care going
forward. The inability to remedy the issue is premised on the fact
that she fails to recognize what issues actually brought these
children into care.

She continued to hold out a narrative that the . . . perpetrator of
the abuse to [T.D.N.T.R.] is now potentially able to care for these
children and keep these children safe. That suggests a certain
disconnect from reality. . . . The disconnect from reality in
suggesting that as of today, even knowing that the father at some
point admitted that the story they told originally about the child
falling on the bed was a complete lie.

N.T., 8/15/17, at 124-128.

Mother’s testimony supports the court’s findings. Mother acknowledged
that she did not previously provide full, complete, accurate, and truthful
information regarding how T.D.N.T.R. was injured in April 2015 because she
“was scared.” N.T., 8/15/17, at 102. She testified on direct examination,

Q. What were you scared of?

A. [B]ecause my son had injuries and I knew in my heart that it
was an accident.

-16-
J-S14002-18

A. I knew that when he went to get medical attention... [h]Je
was well-taken care of and... they figured it out, you know, what
his injuries were and he was able to make medical progress.
Id. at 102-103.
With respect to how T.D.N.T.R.’s injuries occurred, she testified as

follows on direct examination:

Q. [Y]ou said that an argument took place between you and
[Father], correct?

A. Yes.

Q. And you said in the past that he became aggressive towards
you, correct?

A. Yes.

Q. What happened after [Father] became aggressive towards you
while you were holding [T.D.N.T.R.]? What happened to your son?

A. I remember placing him on the bed and [Father], at that time,
. . he wasn’t near me at the time, but at some point, I
accidentally moved back on my son. And that’s how he got
injured.

THE COURT: I’m not sure I understand what you’re saying.
You moved back on your son, what does that mean?

[A.] That means that I had rolled back on my son in the
bed, just perceived trying to -

THE COURT: It’s the same story you told the [cJourt, you
fell on top of the child when the child was in the bed, correct?

[A.] I wouldn’t say I fell, but I moved back on him.

Id. at 105-106.

-17-
J-S14002-18

In her cross-examination by the GAL, Mother testified regarding
T.D.N.T.R.’S injuries before April 17, 2015, as follows.

Q. [T.D.N.T.R.] had injuries prior to this incident, is that correct?

A. Yes.

Q. Where did they come from?

A. There was an issue with his car seat. I took him to CHOP

[Children’s Hospital of Philadelphia] and I remember trying to take

him out of his car seat and I didn’t realize the restraints were on

and he fell back. But CHOP examined him and saw that there

were no injuries.

Q. Was he injured as a result of [Fjather’s abuse prior to this
incident?

A. No.
Id. at 109-110.
In addition, Mother testified that Father should have a relationship with
the Children, and that they may be safe in his care, as follows.
Because he is a good father and he advocates for his children. He
loves his children and he always makes them a priority. And
despite what happened between myself... and him, that we no
longer have a romantic relationship. We -- when I say working
relationship, we work together for the interest of the children. And
working relationship means co-parenting.
Q. You believe the [C]hildren would be safe in [F]jather’s care?
A. They have been. I understand he’s been in unsupervised

visitation for four months with no issue. He’s had them for entire
weekends almost with no issue.

-18-
J-S14002-18

Id. at 112.’

Ms. Ford-Green’s testimony likewise supports the trial court’s findings
regarding Mother’s failure to complete her domestic violence and child abuse
SCP goals. Ms. Ford-Green testified that Mother completed the parenting
program at ARC, and that she was consistent with her weekly two-hour
supervised visits at the agency. Id. at 77, 79. However, Mother did not
permit Ms. Ford-Green to assess her home. Id. at 85. In addition, although
Mother attended a domestic violence program at Temple University, Ms. Ford-
Green testified that Mother refused to tell her whether she was consulting with
a licensed therapist as recommended by Dr. Williams. Id. at 90-91, 93.
Therefore, Ms. Ford-Green testified that Mother did not comply with obtaining
domestic violence and child abuse services. Id. at 77, 85.

Mother testified that, for the past two years, she has attended the
requisite domestic violence program at Women in Transition. Id. at 99. On
cross-examination by DHS, Mother acknowledged that Dr. Williams reviewed
documentation from Women in Transition in conducting the parenting capacity

evaluation. Id. at 108. Mother testified that she is “not sure” if she provided

7? Ms. Ford-Green, the CUA caseworker, testified that Father never had
unsupervised visits with the Children. N.T., 8/15/17, at 115. She explained
that the visits were supervised at his sister’s house. However, since April
2017, Father’s supervised visits have occurred at the agency because, as
discussed above, he “finally confessed” that he “hit [Mother] and that
[T.D.N.T.R.] fell from her hand and on a hard surface.” Id, at 115-116.

-19-
J-S14002-18

Ms. Ford-Green with the information she requested regarding her domestic
violence therapy. Id, at 110-111.

In addition, Mother acknowledged that she has not complied with her
SCP objective to attend the Children’s medical appointments. Id, at 111, 114.
Specifically, Mother testified on cross-examination by the Child Advocate:

Q. Have you ever attended any of [T.D.N.T.R.’s] medical
appointments?

A. I have in the past when my work schedule allowed. Just
because of my schedule, I pretty much allow his father to take
over, because he has more flexible time.

Id, at 114. In addition, Mother testified on cross-examination by the GAL:
Q. Did you attend any of [L.M.R.’s] medical appointments?
A. No, I couldn’t make it because of my work schedule.

Q. Did you attend any of her educational appointments?

A. Because of my work schedule, I couldn’t make it, but I did
speak with the teacher or the counselor afterwards.

Id, at 111-112.

Based on the foregoing, we conclude that the testimonial evidence
supports the trial court’s findings, and we discern no abuse of discretion by
the court in terminating Mother’s parental rights pursuant to Section
2511(a)(2). The record demonstrates that the repeated and continued
incapacity, abuse, and/or refusal of Mother to (1) reveal the full truth about
the manner in which T.D.N.T.R. sustained his nearly fatal injuries; (2)

acknowledge Father’s risk to the safety of the Children; and (3) obtain

-20 -
J-S14002-18

domestic violence and child abuse counseling from a licensed therapist, have
caused the Children to be without essential parental care, control or
subsistence necessary for their physical or mental well-being. Further, with
respect to L.M.R., in light of her gross developmental delays while in Mother’s
custody and her significant improvement while in foster care, Mother’s
repeated and continued incapacity and/or refusal to attend any of L.M.R.’s
medical or educational appointments has caused her to be without essential
parental care, control or subsistence necessary for her physical or mental well-
being. Finally, the causes of Mother’s incapacity, abuse, and/or refusal cannot
or will not be remedied insofar as the Children have been in placement since
April of 2015, and Mother’s parental incapacity continued to persist up through
and including the termination hearing 28 months later.
With respect to Section 2511(b), we are governed by the following
settled principles.
While a parent’s emotional bond with his or her child is a major
aspect of the subsection 2511(b) best-interest analysis, it is
nonetheless only one of many factors to be considered by the
court when determining what is in the best interest of the child.
In re K.K.R.S., 958 A.2d 529, 533-536 (Pa. Super. 2008). The
mere existence of an emotional bond does not preclude the
termination of parental rights. See In re T.D., 949 A.2d 910 (Pa.
Super. 2008) (trial court’s decision to terminate parents’ parental
rights was affirmed where court balanced strong emotional bond
against parents’ inability to serve needs of child). Rather, the
orphans’ court must examine the status of the bond to determine
whether its termination “would destroy an existing, necessary and
beneficial relationship.” In re Adoption of T.B.B., 835 A.2d 387,

397 (Pa. Super. 2003). As we explained in In re A.S., 11 A.3d
473, 483 (Pa. Super. 2010),

-21-
J-S14002-18

[I]n addition to a bond examination, the trial court can
equally emphasize the safety needs of the child, and should
also consider the intangibles, such as the love, comfort,
security, and stability the child might have with the foster
parent. Additionally, this Court stated that the trial court
Should consider the importance of continuity of
relationships and whether any existing parent-child bond
can be severed without detrimental effects on the child.
In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011).

Furthermore, our Supreme Court has stated that, “[c]lommon sense
dictates that courts considering termination must also consider whether the
children are in a pre-adoptive home and whether they have a bond with their
foster parents.” In re T.S.M., supra at 268. The Court directed that, in
weighing the bond considerations pursuant to Section 2511(b), “courts must
keep the ticking clock of childhood ever in mind.” Id. at 269. The 7.S.M.
Court observed that, “[c]hildren are young for a scant number of years, and
we have an obligation to see to their healthy development quickly. When
courts fail . . . the result, all too often, is catastrophically maladjusted
children.” Id.

At the time of the subject proceedings, the Children were two and a half
and six years old, respectively. As best we can discern, they were in separate
foster homes. The testimony of Ms. Ford-Green supports the following
findings by the trial court.

This [c]ourt heard credible evidence by CUA [clase [m]anager,

Ms. Ford-Green, who testified that the Children were positively

bonded to the Foster Parents. They both look to their foster

parents for safety and to meet their needs. She also observed
that a bond exists between Mother and [L.M.R.], but it is not a

-22-
J-S14002-18

parental bond, [and] instead resembles a bond with an aunt who

visits and brings food and gifts. She opined that Mother is not

bonded to [T.D.N.T.R.], at all. She has also observed Mother’s
interaction with the Children at the supervised visits, noting that

Mother would pay more attention to her daughter than her son,

and she had to be prompted to attend to the Children. Ms. Ford-

Green noted that the Children need the safety and security that

Mother cannot provide, and they would not suffer irreparable

harm if Mother’s parental rights were terminated... .

The [c]ourt found credible the evidence that the Children were not

bonded to Mother and do not ask to be reunited with her.

Therefore, this [c]ourt reasoned that the Children would not suffer

irreparable harm if Mother’s parental rights were terminated... .

Trial Court Opinion, 11/9/17, at 33-34. Accordingly, we discern no abuse of
discretion pursuant to Section 2511(b).

Finally, we observe that Mother alleged in her concise statement that
the trial court violated her rights under the Sixth Amendment of the United
States Constitution by denying her request for a continuance on the day of
the hearing for the purpose of retaining another attorney. We review the trial
court’s denial of Mother’s request for a continuance for an abuse of discretion.
See Commonwealth v. Boxley, 948 A.2d 742, 746 (Pa. 2008).

In its Rule 1925(a) opinion, the trial court properly stated,
“Constitutional rights in proceeding[s] to terminate parental rights derive from
[the] due process clause of [the] Fourteenth Amendment, rather than from
[the] Sixth Amendment.” Trial Court Opinion, 11/9/17, at 28 (citations

omitted). We have explained, “Due process requires nothing more than

adequate notice, an opportunity to be heard, and the chance to defend oneself

-23-
J-S14002-18

in an impartial tribunal having jurisdiction over the matter.” In re J.N.F., 887
A.2d 775, 781 (Pa. Super. 2005).

The trial court aptly explained that, at the beginning of the subject
proceedings, Mother sought to replace Attorney Voci, “stating she had not
been able to reach him by telephone and he had not responded to her last
text to him in April, so she fired him that morning.” Trial Court Opinion,
11/9/17, at 29. In response, Attorney Voci stated to the court, “When I
arrived this morning, I greeted her and she indicated that she no longer
wished me to represent her in this case. As an officer of this [cJourt, I can
also tell the [cJourt that I have not been paid in full, but I’m ready, willing and
able to proceed if the [c]ourt wishes to today.” Id. (citing N.T., 8/15/17, at
19-20). We further observe that Attorney Voci stated to the court, “At the
last listing of this case .. ., we met in the room and [I] made very clear [to
Mother] as to what was being proposed in terms of the termination of parental
rights. I also made it clear what I believed was the proper course of action.
My client [has] had no contact with me whatsoever since the last listing of the
case....” N.T., 8/15/17, at 19.

The court found on the record in open court that Mother’s request was
an “unmasked attempt[] to delay and obfuscate these proceedings. There
was a representation at the last listing that there would be certain witnesses,
certain documents [presented at the hearing]. ... [W]e’re now four months

out from the original listing and there was enough time and enough

- 7274 -
J-S14002-18

consideration to allow this case to be prepared for trial. The [C]hildren have
been in placement for 28 months. The matter will proceed.”® N.T., 8/15/17,
at 24-25. Upon careful review, we discern no abuse of discretion.

Based upon our independent review of Mother’s claims in light of the
record evidence, we conclude that she is not entitled to relief. Moreover, the
record does not reveal any non-frivolous issues overlooked by counsel. See
Flowers, 113 A.3d at 1250. Accordingly, we grant counsel’s motion to
withdraw, and we affirm the decrees involuntarily terminating Mother’s
parental rights.

Motion to withdraw granted. Decrees affirmed.

Judge McLaughlin joins the memorandum.
Judge Ransom concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Es¢
Prothonotary

Date: 6/5/18

8 In its Rule 1925(a) opinion, the court further emphasized that, “during the
entire term of this dependency case regarding her Children, Mother was
represented by three attorneys,” including Attorney Voci, and that she was
represented in a competent manner by them. Trial Court Opinion, 11/9/17,
at 29.

-25 -